UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVUE TECHNOLOGIES CORP., ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil No. 06-0327 (JDB) |
| ) | |
| ) | |
| DCI GROUP, L.L.C., ) | |
| ) | |
| Respondent. ) | |

**PETITIONER'S REPLY IN SUPPORT
OF MOTION TO STAY ARBITRATION**

Petitioner's motion presents two issues. The threshold or "gateway" issue is whether the arbitrability of the dispute between Petitioner Avue Technologies Corp. ("Avue") and Respondent DCI Group, L.L.C. ("DCI") regarding the so-called "TCS Sponsorship" is for this Court to determine, as Petitioner Avue contends, or for an arbitrator to determine, as Respondent DCI asserts. As demonstrated herein, the issue of arbitrability is for this Court to decide because there is no evidence, much less the required "clear and unmistakable" evidence, that the parties agreed to submit this threshold issue to an arbitral panel.

Assuming that this Court finds that the gateway issue of arbitrability is for it to decide, the Court must then decide whether, in fact, the parties agreed to submit disputes relating to the TCS Sponsorship to arbitration. That is because in the absence of such an agreement DCI has no right to pursue arbitration of the TCS Sponsorship dispute. As demonstrated herein, there is no evidence of any such agreement by the parties. Accordingly, the Court should hold that DCI's

claims against Avue relating to the TCS Sponsorship are not arbitrable and should grant Avue's motion to stay.

I. **THIS COURT SHOULD DECIDE THE ARBITRABILITY ISSUE.**

It is axiomatic that arbitration is wholly a matter of contract. Accordingly, "the [Federal Arbitration Act ("FAA")] does not require parties to arbitrate when they have not agreed to do so . . ." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). It is equally well-established that "whether or not [a party] [i]s bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the [c]ourt." *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962). Thus, as this Court held in *Booker v. Robert Half, Int'l, Inc.*, 315 F. Supp. 2d 94 (D.D.C. 1994): "It is the court, not the arbitrator, that must decide whether a dispute is subject to arbitration: 'a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability' for a court to decide." *Id.* at 97, *quoting Howsam v Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).[1]

The *only* circumstance where it is appropriate for a court to decline to decide a gateway arbitrability issue is when there is "clear and unmistakable" evidence that the parties agreed to have an arbitrator, rather than the courts, decide the issue. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Communications Workers of America.*, 475 U.S. 643, 649 (1986)). In other words, not only is there no presumption in favor of allowing arbitrators to decide arbitrability, the presumption is precisely the opposite. *See Masurovsky v. Green*, 687 A.2d 198, 204-05 (D.C. 1997) (applying *First Options* and holding that the issue of arbitrability was for the trial court, not an arbitrator).

---

[1] DCI's suggestion (*see* DCI Mem. at 6) that this Court's decision in *Booker* somehow supports its argument that an arbitrator, rather than the Court, should decide the gateway arbitrability issue is wholly unfounded.

DCI concedes that to avoid having this Court exercise its presumptive power to decide the arbitrability of the TCS Sponsorship dispute, it must adduce "clear and unmistakable evidence" of an agreement by the parties to submit this arbitrability issue to an arbitral panel. Respondent cannot meet this burden.

The sole "evidence" to which Respondent points in an effort to satisfy the governing "clear and unmistakable evidence" test is that the Consulting Agreement that the parties executed on March 9, 2004 to govern the provision of services related to "legislative and administrative initiatives" contains an arbitration clause that incorporates by reference the American Arbitration Association ("AAA") Commercial Arbitration Rules. Because Rule 7(a) of the AAA Rules *authorizes* an arbitrator "to rule on his or her own jurisdiction," DCI argues that the general incorporation of the AAA rules is positive proof that Avue and DCI agreed to submit all threshold issues of arbitrability to an arbitral panel rather than to the courts.

DCI's argument makes a mockery of the "clear and unmistakable evidence" standard established by the Supreme Court. It should therefore be rejected. It would be one thing if the AAA Rules provided that an arbitrator *must* exclusively decide all jurisdictional issues and such a rule were incorporated in the parties' agreement.[2] The AAA Rules, however, merely empower the arbitrator to rule on the scope of his jurisdiction. In other words, the AAA Rule is permissive, not mandatory. At most, therefore, the incorporation of AAA Rule 7(a) evidences an agreement by the parties that if both parties to an arbitration submit a jurisdictional issue for resolution by the arbitrator, the losing party in the arbitration cannot successfully challenge the award on the ground that the arbitrator was without jurisdiction. But merely agreeing that an

---

[2] Avue does not dispute that the reference to the AAA Rules in an agreement has the effect of incorporating those rules into the contract. *See* DCI Mem. at 4. The disagreement here is not whether the AAA Rules are deemed part of the parties' Consulting Agreement but rather whether the incorporation of the permissive terms of AAA Rule 7(a), without more, provides "clear and unmistakable evidence" that the parties intended to deprive the courts of their presumptive jurisdiction to determine the gateway issue of arbitrability.

arbitrator has power to decide jurisdictional issues cannot reasonably be said to reflect an agreement to deprive the courts of their authority and responsibility to decide jurisdictional issues. Even if such an argument were plausible (which it is not), it falls far short of meeting the Supreme Court's "clear and unmistakable evidence standard."[3]

Judge Sullivan's decision in *Sapiro v. Verisign*, 310 F. Supp. 2d 208 (D.D.C. 2004), confirms that this Court, not an arbitrator, should decide the gateway issue of whether the parties' TCS Sponsorship dispute is subject to arbitration. In *Sapiro*, a discharged employee brought a discrimination claim against her former employer. The employer sought to compel arbitration of the discrimination claim, but the plaintiff contended that the defendant was not a party to, and therefore could not rely on, the arbitration agreement on which the defendant predicated its motion to compel. Advancing the same argument that DCI makes here, the employer argued that "the parties agreed to submit questions of arbitrability to the arbitrator." 310 F. Supp. 2d at 211. The sole support proffered by the employer for this argument was that the applicable employment arbitration rules contained a provision that stated "[t]he arbitrator has the authority to resolve any dispute relating to the formation, interpretation, applicability or enforceability of the Arbitration Agreement." *Id.* Judge Sullivan rejected the employer's argument and held that the court, not the arbitrator, "is the proper entity to make [the arbitrability] determination." *Id.* at 212. This Court should similarly reject DCI's argument here.

---

[3] Under Respondent's theory, this common provision of most sets of arbitration rules would, without more, automatically divest the courts of all power to decide arbitrability issues – overriding in every case the well-established presumption that courts, not arbitrators, should decide the threshold issue of arbitrability. *See, e.g.*, Int'l Chamber of Commerce, Rules of Arbitration, Article 6 ¶ 2 ("any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."); United Nations Commission on International Trade Law Rules Art. 21.1 ("arbitral tribunal shall have the power to rule on objections that it has no jurisdiction. . . .").

4

DCI fails even to address *Sapiro*. Rather, DCI asks this Court to disregard District of Columbia law and instead apply Arizona law to the arbitrability determination even though none of the parties' dealings relating to the TCS Sponsorship took place in Arizona.[4] There is, however, no basis for applying Arizona law to the arbitrability issue presented here.

Because this Court is sitting in diversity, it must apply state law to all substantive issues, except for those controlled by the FAA. *Erie Ry. Co. v. Tompkins*, 304 U.S. 64 (1938). Under *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), the Court should look to the choice of law rules of the forum state – here, the District of Columbia – to determine what substantive state law to apply to the contract interpretation issues presented in this case. District of Columbia courts apply a governmental interests analysis in choice of law cases, which involves determining which jurisdiction's policy would be most advanced by the application of its law to the facts of the case under review. This inquiry requires the court to examine where the relationship between the parties is centered and where the key conduct occurred. *See District of Columbia v. Coleman,* 667 A.2d 811, 816 (D.C. 1995); *see generally Bryson v. Gere,* 268 F. Supp. 2d 46 (D.D.C. 2003). It is well-established that District of Columbia courts will apply D.C. law unless a foreign jurisdiction has an even greater interest in the controversy. *See, e.g., Coleman,* 667 A.2d at 816.

There can be no doubt that the District of Columbia has a demonstrably greater interest in the parties' TCS Sponsorship dispute than does Arizona. As demonstrated in the attached

---

[4] DCI seeks the application of Arizona law because it believes that the Arizona Court of Appeals decision in *Brake Masters Sys., Inc. v. Gabbay*, 78 P.3d 1081 (Ariz. Ct. App. 2003) supports its argument. The posture of that case was entirely different than the instant case. There, the party challenging the jurisdiction of the arbitral panel had failed to raise that challenge until after the panel ruled against it on the merits. That belated challenge to the jurisdiction of the arbitral panel stands in stark contrast to Avue's immediate jurisdictional challenge in the present case. *Brake Masters* is further distinguishable from the instant case because in *Brake Masters* there was no disagreement about whether the contract containing the arbitration clause applied, whereas Avue contends here that the Consulting Agreement does not apply at all to the TCS Sponsorship relationship. In any event, even if *Brake Masters* can fairly be read to support DCI's position, this Court should decline to follow *Brake Masters* because its reasoning is so clearly inconsistent with the Supreme Court's holding in *First Options*.

5

Declaration of James D. Miller, Co-CEO of Avue, <u>all</u> of the parties' dealings relating to the TCS Sponsorship took place in D.C.  <u>None</u> took place in Arizona.  Thus:

1. The parties' discussions leading up to the oral understanding about the TCS Sponsorship all took place in the District of Columbia.

2. DCI maintains a substantial office in D.C.

3. The invoices for the TCS Sponsorship were generated in D.C. and Avue sent its payments to DCI's D.C. office.

4. The TCS service is written and published in D.C.

5. Whenever the parties met to discuss the TCS Sponsorship, the meetings took place in D.C.

Although DCI is organized under the laws of Arizona, this sole point of contact with the state of Arizona is not sufficient to overcome the District of Columbia's strong interest in applying its own law to this dispute.[5]  Applying D.C.'s governmental interests analysis, the Court should reject DCI's argument for the application of Arizona law to this dispute.

Finally, in its desperation to avoid having this Court rule on the arbitrability issue, DCI makes the spurious argument that Avue is somehow "estopped" from arguing that this Court should rule on the arbitrability of the TCS Sponsorship dispute because Avue specifically objected to the jurisdiction of the arbitral panel in the Answering Statement it filed with the AAA.  *See* DCI Mem. at 6.  In order to preserve its objection to the jurisdiction of the arbitral panel, Avue had no choice but to include such an objection in its initial filing.  Such a protective

---

[5] DCI's sole argument for applying Arizona law to the arbitrability determination is that the parties' March 9, 2004 Consulting Agreement contains an Arizona choice of law clause. But the argument that this choice of law clause applies here presupposes the outcome of this lawsuit – because the merits issue in this case is whether that agreement, which is limited to services involving "legislative and administrative" initiatives, applies at all to the TCS Sponsorship "news generation" services provided by DCI for a separate fee. It is Avue's position that the Consulting Agreement does not govern the TCS Sponsorship or disputes arising out of it, and therefore it did not consent to having any issues related to the TCS Sponsorship governed by the law of Arizona. Under these circumstances, this Court should apply the generally applicable District of Columbia choice of law principles.

objection cannot possibly be construed as an admission by Avue that the arbitrators, rather than this Court, should decide the gateway arbitrability issue.

In sum, DCI has failed to adduce any evidence, much less demonstrated by the required "clear and unmistakable evidence," that Avue agreed to submit the gateway issue of the arbitrability of the TCS Sponsorship dispute to an arbitrator. That determination, therefore, is one to be made by this Court.

## II.  THE TCS SPONSORSHIP SERVICES DO NOT FALL WITHIN THE SCOPE OF THE CONSULTING AGREEMENT AND THUS ARE NOT ARBITRABLE.

The determination of whether the parties' dispute relating to the TCS Sponsorship services provided (or not) by DCI is arbitrable turns on whether the parties agreed to submit such a dispute to arbitration. Because arbitration is entirely a matter of contract, it extends "only [to] those disputes . . . that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943. Thus, this Court must decide whether the TCS Sponsorship falls within the scope of the Consulting Agreement, as that is the only potential source of an arbitration agreement between the parties. For the reasons set forth below, the terms and conditions of the Consulting Agreement, including its arbitration clause, do not apply to the TCS Sponsorship. Accordingly, Avue cannot be forced to arbitrate the parties' TCS Sponsorship dispute, and Avue's motion therefore should be granted.

The Consulting Agreement between Avue and DCI is clear and unambiguous.[6] For a monthly fee of $20,000, DCI agreed to "advise" Avue with respect to "agreed-upon legislative and administrative initiatives." This language contemplates a specific type of activity – the promotion of sales opportunities for Avue with the U.S. Government by fostering contacts for Avue with key individuals in both the legislative and executive branches, including procurement officials. These services are markedly different from those provided under the TCS Sponsorship arrangement, which involved the generation of favorable publicity about Avue's products and services by commissioning the creation of positive "news" stories that purported to be the work of independent journalists.[7] In short, there is no reasonable way, short of torturing the English language, to fit the "quasi-journalistic" TCS Sponsorship service into the scope of the Consulting Agreement, which was limited to "legislative and administrative initiatives."

The primary basis for DCI's argument that the parties intended the TCS Sponsorship to be governed by the terms and conditions of the Consulting Agreement appears to be that "DCI charged for the TCS initiative and Avue did not object to the charges and paid them for many months." DCI Mem. at 7. The fact that Avue paid for the generation of favorable "news" stories says nothing whatsoever about whether Avue, or DCI for that matter, intended the Consulting Agreement to govern those services. In fact, it says nothing about what terms and conditions

---

[6] "The basic rule of contract construction gives priority to the intentions of the parties." *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 235 (D.D.C. 1996) (quoting *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)). In *Mercer Mgmt. Consulting*, the Court described D.C. law regarding contract interpretation in the following way:

> In ascertaining the meaning and intent of contract language, the starting point is obviously the language itself. A contract is construed as a whole, giving effect to all of the contract's provisions and avoiding a construction which would render one of those provisions meaningless . . . [T]he greatest weight should be given to the express language of the contract itself.

920 F. Supp. at 235-36 (internal citations omitted).

[7] Indeed, the personnel providing the TCS Sponsorship services were different from those providing the legislative and administrative services under the Consulting Agreement.

would govern the TCS Sponsorship, other than the amount that would be paid on a monthly basis.

The terms of the Consulting Agreement, as well as its negotiating history, confirm that the parties did not intend to incorporate the TCS Sponsorship services into their Consulting Agreement. The parties did not execute the Consulting Agreement until March 9, 2004. By that time, DCI had been billing Avue for TCS Sponsorship services for three months (since December 2003). If the parties had intended to fold the TCS Sponsorship into the Consulting Agreement, they could (and presumably would) have done so with the addition of just a few extra words to the Consulting Agreement. Their failure to do so is strong evidence that they did not intend to include the TCS Sponsorship in the scope of the Consulting Agreement.

The failure of the parties to expressly include the TCS Sponsorship in the Consulting Agreement, or even to execute a separate writing amending the Consulting Agreement to include the TCS Sponsorship, is particularly significant because the Consulting Agreement, by its own term, bars any claim of "oral amendment." Specifically, the Consulting Agreement states that this "Agreement constitutes the entire Agreement between the parties with respect to the subject matter hereof . . . Any modification of this Agreement will be effective only if it is in writing signed by the parties hereto." Where, as here, a contract contains an integration clause, the "written language embodying the terms of an agreement will govern the rights and liabilities of the parties . . . unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake." *Scrimgeour v. Magazine*, 429 A.2d 187, 188 (D.C. 1981) (quoting *Slice v. Carozza Prop., Inc.*, 137 A.2d 687, 693 (Md. 1958)). The parties' failure to execute any writing regarding the TCS Sponsorship thus provides further evidence that they did not intend the Consulting Agreement to apply to the TCS

Sponsorship services provided by DCI.

Because the language of the Consulting Agreement clearly does not encompass the TCS Sponsorship services, and because the negotiating history of the agreement confirms that the parties did not intend to fold the TCS Sponsorship into the Consulting Agreement, the Court should hold that Avue and DCI did not agree to submit TCS Sponsorship disputes to arbitration. Accordingly, the Court should grant Avue's motion to stay.

If, however, the Court concludes that the phrase "legislative and administrative initiatives" in the Consulting Agreement can somehow be read to encompass the TCS Sponsorship "news" creation services, then the Court should deny Avue's motion without prejudice to allow the parties to conduct discovery regarding the intent of the parties. That is because if the Court finds that the "legislative and administrative initiatives" language of the Consulting Agreement can arguably be read to encompass the types of services provided by DCI under the TCS Sponsorship, then the Court should consider extrinsic evidence in order to ascertain whether the parties, in fact, intended the Consulting Agreement to apply to those services. As the District of Columbia Circuit stated in *Farmland Indust., Inc. v. Grain Bd. of Iraq,* 904 F.2d 732, 736 (D.C. Cir. 1990): "When the meaning of a contract term is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at discerning the intent of the parties." In order to develop this extrinsic evidence, the parties should be afforded an opportunity to conduct discovery. *See, e.g., Potomac Elec. Power Co. v. Mirant Corp.,* 251 F. Supp. 2d 144, 148-51 (D.D.C. 2003) (where success of summary judgment motion depends on court finding contractual provision unambiguous, court will deny the motion without prejudice and order discovery so that parties may identify and introduce extrinsic evidence to clarify their intent.)

Accordingly, if this Court does not agree with Avue that the plain language and undisputed negotiating history of the Consulting Agreement make it clear that the Consulting Agreement does not encompass the TCS Sponsorship Services, the Court should deny Avue's motion without prejudice and set a discovery schedule.

## **CONCLUSION**

For the foregoing reasons, Petitioner's motion to stay arbitration should be granted.

Respectfully submitted,

_____/s/_____
Andrew H. Marks, D.C. Bar #932269
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2920

Counsel for Petitioner
Avue Technologies Corp.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVUE TECHNOLOGIES CORP., )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>)<br>DCI GROUP, L.L.C., )<br>)<br>Respondent. )<br>) | Civil No. 06-0327 (JDB) |

**PROPOSED ORDER**

Upon consideration of Petitioner's Reply in Support of its Motion to Stay Arbitration and the entire record herein, it is, this ____ day of _____, hereby

ORDERED, that Petitioner's Motion be, and the same hereby is, GRANTED; and it is further

ORDERED, that DCI shall not pursue its TCS Sponsorship claims in an arbitration.

_____
Hon. John D. Bates
United States District Judge

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March 2006, a true and correct copy of Petitioner's Reply in Support of its Motion to Stay Arbitration and the Proposed Order were served via the Court's Electronic Case Filing/Case Management System on the following counsel of record in this matter:

>Robert L. Gulley, D.C. Bar #394061
>Lathrop & Gage L.C.
>Franklin Square, Suite 1050 East
>1300 Eye Street, N.W.
>Washington, D.C.  20005

>_____/s/_____
>Andrew H. Marks

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVUE TECHNOLOGIES CORP., )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>DCI GROUP, L.L.C., )<br>)<br>Respondent. )<br>) | Civil No. 06-0327 (JDB) |

### DECLARATION OF JAMES D. MILLER

1. My name is James D. Miller. The matters set forth herein are within my personal knowledge and are true and correct.

2. I am the Co-Chief Executive Officer of Avue Technologies Corporation.

3. Along with Co-Chief Executive Officer Linda Brooks Rix, I conducted all of the discussions with DCI Group concerning the services to be provided by it in connection with the so-called "TCS Sponsorship." The persons at DCI with whom I discussed the TCS Sponsorship included Douglas Davenport, Tim Hyde, Skip Joslin, Justin Peterson, and Andrew McKenna.

4. All of the communications between Avue and DCI relating to the TCS Sponsorship took place while I was in Washington, D.C. None of the communications relating to the TCS Sponsorship took place while I was in Arizona.

5. All of the in-person meetings I have had relating to the TCS Sponsorship occurred in Washington, D.C. None took place in Arizona.

6. The persons at DCI with whom I have had discussions relating to the TCS Sponsorship maintain offices in Washington, D.C., and my belief is that they were in these offices during all of my telephonic communications with them relating to the TCS Sponsorship.

7. The persons at DCI who have provided services relating to the TCS Sponsorship are, to the best of my knowledge, all based in Washington, D.C. At no time that I am aware of has DCI provided any services related to the TCS Sponsorship from Arizona.

8. The payments that Avue made for TCS Sponsorship services were sent to DCI's office in Washington, D.C.

I declare under penalty of perjury that the foregoing is true and correct.

3/22/06
Date

James D. Miller

Sworn to and subscribed before me on this 22 day of March 2006.

Delores Hardy
Notary Public

DELORES HARDY
Notary Public of District of Columbia
My Commission Expires April 30, 2008