UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AVUE TECHNOLOGIES CORP.,**<br><br>Movant,<br><br>v.<br><br>**DCI Group, L.L.C.,**<br><br>Respondent. | Civil Action No. 06-327 (JDB) |

**MEMORANDUM OPINION**

Movant Avue Technologies Corporation ("Avue") brings this action seeking a stay of arbitration with respect to certain claims submitted by respondent DCI Group, LLC ("DCI"). The claims relate to Avue's obligations pursuant to an agreement to make certain payments for "journo-lobbying" services provided by Tech Central Station ("TCS"), a division of DCI. For the reasons that follow, the Court will deny Avue's motion and dismiss this action.

**BACKGROUND**

Avue is a Delaware corporation with its principal place of business in Tacoma, Washington. Avue's Mot. Stay at 2 ¶ 3. Avue is engaged in the business of providing employment-related "technology-based solutions" for government agencies. Id. DCI is a limited liability company with its principal place of business in Arizona. Notice of Removal at ¶ 2. DCI provides lobbying services, using its many contacts in the legislative and executive branches to further the agendas of its various clients. Avue's Mot. Stay at 2 ¶ 4.

On March 9, 2004, Avue and DCI entered into a consulting agreement ("Consulting

Agrmt."), pursuant to which DCI would "assist and advise [Avue] with respect to agreed-upon legislative and administrative initiatives," Consulting Agrmt. at 1 § 1, for the sum of $20,000 per month, id. at 2 § 4. The Consulting Agreement was made retroactively effective as of December 1, 2003. Id. at 2. By that time, DCI had already been providing services to Avue for many months. DCI's Opp'n at 7. The Consulting Agreement "shall be deemed to have been made in the State of Arizona, and shall be construed and enforced in accordance with the law of the State of Arizona, without reference to principles of conflicts of laws thereof." Consulting Agrmt. at 3 § 8(b). The document places strict limits on modifications, providing that no modification will be effective unless both in writing and signed by the parties. Id. at 3 §§ 6, 7. There is also an integration clause, which states that

> [t]his Consulting Agreement constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supercedes [sic] any and all agreements, negotiations, communications, writings, and understandings, either oral or written, between the parties hereto with respect to the rendering of Services by Consultant for Client and contains all of the covenants and agreements between the parties with respect to the rendering of such services in any manner whatsoever. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

Id. at 3 § 7. Finally, the Consulting Agreement includes a broad, but standard, arbitration clause, pursuant to which

> [a]ny claim, dispute, controversy or other matter in question with regard to this Agreement shall exclusively be subject to final binding arbitration in accordance with the Commercial Arbitration rules and regulations of the American Arbitration Association (AAA). . . . The parties or the arbitrators, as appropriate, shall undertake the duties of the AAA under the AAA rules. All arbitrations shall be conducted in the State of Arizona.

Id. at 3 § 8(c).

Sometime "in or about December 2003," Avue and DCI reached an oral understanding ("TCS Agreement") that TCS (a division of DCI that is a daily online publication concerning science, technology, and politics) would generate favorable publicity about Avue's products through various journo-lobbying initiatives.[1]  Avue's Mot. Stay at 3 ¶ 9.  Pursuant to the TCS Agreement, Avue agreed to pay DCI an additional $20,000 per month.  Neither party contests the existence of the Consulting Agreement or the existence of the TCS Agreement, and no dispute regarding the quality of services provided by DCI pursuant to either agreement is currently before the Court.  DCI claims that it billed Avue for services performed under the Consulting and TCS Agreements from December 2003 through August 2004, during which time Avue remitted the agreed-upon payments -- a total of $40,000 per month -- without complaint.  See DCI's Opp'n at 7.  Thereafter, however, DCI alleges that Avue stopped making payments without cause.

On November 28, 2005, DCI initiated an arbitration proceeding with the American Arbitration Association ("AAA"), based upon its interpretation of the arbitration clause contained in the Consulting Agreement, in an attempt to obtain the unremitted payments.  Avue filed a document entitled "Answering Statement and Counterclaims" on December 19, 2005, in which it contended that the claims related to

---

[1]"Journo-lobbying" is the process through which communication channels are used to disseminate positive press pieces that masquerade as genuine news stories created by independent journalists.  Pl's. Mot. Stay at 3 ¶ 9.

the TCS Agreement were improperly submitted for arbitration because the TCS Agreement is not part of the Consulting Agreement and, accordingly, is not subject to the arbitration clause contained in the Consulting Agreement.

On February 1, 2006, Avue filed in D.C. Superior Court a motion to stay arbitration under the D.C. Arbitration Act, D.C. CODE ANN. §16-4302, seeking to sever the TCS-related claims from the arbitration proceedings.  Avue's Mot. Stay at 1.  DCI timely filed a notice of removal to this Court pursuant to 28 U.S.C. §1441.  In this action, Avue contends that the TCS Agreement is outside the scope of the services defined in § 1 of the Consulting Agreement and, furthermore, cannot be viewed as a modification of the Consulting Agreement because there is no written memorialization of the TCS initiative.  Avue's Mot. Stay at 3-4 ¶10.  Avue interprets the integration clause of the Consulting Agreement strictly, arguing that it flatly precludes any modification or supplementation that is not in written format.  Avue also contends that the parties never agreed that disputes arising from the TCS Agreement would be submitted to arbitration.  Id. at 4 ¶11.

DCI, on the other hand, claims that §1 of the Consulting Agreement deliberately employs flexible language to describe the services that comprise the subject of the contract.  The language was intended to be vague and amorphous, according to DCI, because the parties desired the flexibility of defining (and redefining) those services throughout the evolution of their professional relationship.  See DCI's Opp'n at 7-8.  Hence, DCI submits that the TCS Agreement is part of the Consulting Agreement -- specifically, that "journo-lobbying" services fall within the ambit of "agreed upon legislative and administrative" initiatives.  As a fallback argument, DCI submits that the

TCS Agreement is a supplement to or modification of the Consulting Agreement, notwithstanding the integration clause. DCI's Stmt. Claims at 3 ¶ 9. Specifically, the definition of services in §1 is sufficiently ambiguous, according to DCI, that the Court should use the parole evidence rule to bring the TCS Agreement within the scope of the Consulting Agreement. Under this logic, the arbitration clause in the Consulting Agreement would also apply to the TCS Agreement. DCI asserts that it fully performed its duties and that Avue has committed a breach of contract by withholding payments in the principal amount of $565,501.51 (as of October 1, 2005). DCI seeks to recover this amount through the arbitration proceeding, as well as interest and attorney's fees. DCI's Stmt. Claims at ¶¶ 14, 17.

Before the Court may consider the core issue of whether the TCS Agreement is subject to arbitration, it must first decide two threshold issues: (1) who is the proper entity to decide whether the TCS Agreement is part of the Consulting Agreement and thus subject to arbitration -- the Court or the arbitration panel? and (2) what law applies in determining that threshold issue -- federal law, Arizona law, or the law of the District of Columbia? The Court will address these issues in turn.

## LEGAL STANDARDS

The Federal Arbitration Act establishes a general policy in favor of arbitration, see, e.g., Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 226, 227 (1987) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)); Mitsubishi Motors Corp. v Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625-26 (1985); Alliance Bernstein Inv. Res. & Mgmt., Inc. v. Schaffran, 2006 WL 945341, at *3 (2d Cir.

Apr. 12, 2006), as do the arbitration statutes of the District, see Motor City Drive LLC v. Brennan Beer Gorman Monk Architects & Interiors, PLLC, 890 A.2d 233, 236 (D.C. 2006), and Arizona, see Harrington v. Pulte Home Corp., 119 P.3d 1044, 1051 (Ariz. Ct. App. 2005). However, this presumption may be reversed with respect to certain gateway issues of arbitrability, see Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002), because arbitration is purely a matter of contract, see AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986), and, hence, "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration?" First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (emphasis in original). "A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., 475 U.S. at 648. Therefore, if a court is called upon to decide the threshold issue of who decides arbitrability, it may not "assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence" to that effect. First Options, 514 U.S. at 944. In determining whether "clear and unmistakable evidence" exists, courts should apply principles of ordinary state-law contract formation. See id. at 944. In the absence of sufficiently "clear and unmistakable evidence," the issue is most properly one for the court, rather than the arbitrator, to consider. Id.; see also Howsam, 537 U.S. at 83.

## ANALYSIS

**I. What Law Applies?**

      DCI contends that, pursuant to the choice of law provision in the Consulting Agreement,

the Court must apply principles of Arizona contract law in determining whether the "clear and unmistakable evidence" standard of First Options is satisfied.  In the alternative, DCI submits that the Court should apply federal law, because the Federal Arbitration Act "governs after removal."  DCI's Opp'n at 3.  Avue, on the other hand, claims that the Court should apply District of Columbia contract law because DCI maintains an office and conducts business in the District, the parties discussed the TCS Agreement in the District, and the location of performance under the contract is the District.  Avue's Mot. Stay at 2 ¶ 2.  To apply Arizona law, Avue continues, would assume the merits of the dispute because it would require an implicit finding that the TCS Agreement is part of the Consulting Agreement.

      To determine what law applies, the Court must necessarily construe the Consulting Agreement -- specifically, the scope of the choice of law provision (§ 8(b)).  The question is whether the choice of law provision is broad enough to encompass the TCS Agreement.  Hence, the Court is "constru[ing] and enforc[ing]" the choice of law provision, which, by its terms, requires that the law of Arizona be used.  Moreover, in order to determine whether the TCS Agreement is part of the Consulting Agreement, the parties are calling upon the Court to interpret several other provisions of the Consulting Agreement, including: (1) the breadth and potentially ambiguous nature of the definition of contractual services in §1; (2) the validity and effectiveness of the integration provision in § 7; (3) the scope and applicability of the arbitration provision in § 8(c); and (4) the meaning of AAA Rule R-7(a), which the parties concede is a provision of the Consulting Agreement by virtue of the fact that the arbitration provision incorporates the AAA rules in their entirety by reference.  Regardless of which way the Court decides to resolve this case, it is certainly called upon to construe or enforce at least one provision of the Consulting

Agreement. Hence, the correct law to apply is the law of Arizona -- even with respect to the threshold arbitrability issue -- as the parties have provided in their contract.

Ultimately, however, this issue is immaterial. The D.C. Arbitration Act and the Federal Arbitration Act are "materially the same in all [relevant] respects." See Masurovsky v. Green, 687 A.2d 198, 204 n.3 (D.C. 1997). In addition, both Arizona and the District have enacted the Uniform Arbitration Act, and, accordingly, their relevant statutory provisions are identical, compare D.C. CODE ANN. § 16-4302(b), with ARIZ. REV. STATS. ANN. § 12-1502(b). All three bodies of law also establish a general policy that strongly favors resolution of disputes through arbitration channels when a valid agreement to arbitrate exists. See, e.g., Alliance Bernstein, 2006 WL 945341, at *3 (noting the strong presumption in favor of arbitration under the Federal Arbitration Act and federal case law); Harrington, 119 P.3d at 1051 (same with respect to Arizona state law); Motor City Drive, 890 A.2d at 236 (same with respect to D.C. law). Whether the Court applies federal law, Arizona law, or the law of the District, the outcome of this case is the same.

**II. Who Decides Whether the TCS Agreement is Subject to Arbitration?**

The parties agree that § 8(c) of the Consulting Agreement incorporates the AAA arbitration rules into their contract. AAA Rule R-7(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Hence, the issue before the Court is whether the incorporation of the AAA rules, and specifically Rule R-7(a), by reference in the Consulting Agreement constitutes "clear and unmistakable evidence" that the parties intended to have an arbitration panel, rather than the Court, determine the gateway issue of whether the TCS

Agreement is subject to arbitration. DCI contends that it does. Avue, on the other hand, asserts that "clear and unmistakable evidence" is a very demanding standard, as to which an incorporation of the AAA rules by reference comes up short. Avue's Reply at 3 & n.2. Avue claims that it never intended, much less agreed, to relinquish its right to have a court decide such a jurisdictional issue.

For support, Avue relies heavily on Sapiro v. Verisign, 310 F. Supp. 2d 208 (D.D.C. 2004), and Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94 (D.D.C. 2004). But these cases are not directly on point. Sapiro did not even address an incorporation of the AAA rules, and it, like Booker, stands only for the proposition that a court is generally the proper entity to decide "whether [an] arbitration agreement establishes a valid contract between the parties." See Sapiro, 310 F. Supp. 2d at 212; Booker, 315 F. Supp. 2d at 98. Avue's reliance on these cases is misplaced because neither case discussed the "clear and unmistakable evidence" standard of First Options, and neither case discussed the precise issue that is presented here -- who decides arbitrability. Quite simply, there are two species of issues that courts appear to classify as "arbitrability" inquiries. The first type, presented by the factual scenarios in Sapiro and Booker, concerns whether there is an agreement to arbitrate at all. The second type focuses on whether a particular issue is within a valid agreement to arbitrate. Here, DCI submits that the arbitration clause in the Consulting Agreement extends to the TCS Agreement, a classic question of the scope, not the existence, of an arbitration agreement. Because the parties agree that there is a valid arbitration clause that binds them, but disagree regarding whether its scope encompasses the TCS Agreement, this case implicates the second type of arbitrability issue, not the first. And the initial question, of course, is who will decide that arbitrability issue.

The distinction may at first blush appear semantic in nature, but it is indeed a matter of substance. See First Options, 517 U.S. at 944-45 (clarifying that the question "who (primarily) should decide arbitrability" is different from the question whether a dispute is arbitrable because it is within the scope of a valid arbitration agreement). The decisionmaker's task is the same with respect to both issues: to ascertain the intent of the parties under applicable principles of contract law. But the "rather arcane" question of who decides arbitrability warrants a reversal of normal presumptions in favor of arbitration so that courts will not assume the parties agreed to arbitrate arbitrability absent "clear and unmistakable evidence." Id.

First Options involved "silence or ambiguity about the question 'who (primarily) should decide arbitrability,'" id., and on the record there the Court concluded that there was no showing of a clear agreement "to have the arbitrators decide (i.e., to arbitrate) the question of arbitrability." Id. at 446. Here, there is no "silence or ambiguity" in the concededly-valid arbitration agreement at issue. The arbitration clause expressly incorporates the AAA rules, which designates (in Rule R-7(a)) the arbitrator as the "who" referred to in First Options. Hence, the "clear and unmistakable" intent of the parties, reflected in Rule R-7(a) -- which is part of their contract -- is to have the arbitrator decide arbitrability. Moreover, the issue ultimately presented is properly framed as "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." Id. at 944-45. On that issue, the presumption against arbitration may not apply, and the general presumption in favor of arbitration would apply with full force. Compare id., with Mitsubishi Motors Corp., 473 U.S. at 626, and Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25. The law of the District recognizes this distinction. See Masurovsky, 687 A.2d at 204-05.

Arizona cases and federal law support this outcome. The Arizona Court of Appeals has squarely held that even under the "clear and unmistakable evidence" standard, the arbitration agreement need not "specifically state that the arbitrator has the primary authority to decide the arbitrability of the issues" if the AAA rules as a whole are incorporated by reference. Brake Masters Sys., Inc. v. Gabbay, 78 P.3d 1081, 1087-88 (Ct. App. Ariz. 2003). This holding was based upon Rule R-8(a), which was later renumbered as Rule R-7(a). Id. at 1085 n.2. Likewise, the weight of authority in the federal courts overwhelmingly supports the same conclusion. See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208, 209 (2d Cir. 2005); see also P&P Indus., Inc. v. Sutter Corp., 179 F.3d 861, 867-68 (10th Cir. 1999) (finding that when a party incorporates the AAA rules by reference, it is bound by all of the procedural rules of the AAA); Rainwater v. Nat'l Home Ins. Co., 944 F.2d 190, 193-94 (4th Cir. 1991) (finding, before First Options, that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference); Commonwealth Edison Co. v. Gulf Oil Corp., 541 F.2d 1263, 1272-73 (7th Cir. 1976) (same); Bryson v. Gere, 268 F. Supp. 2d 46, 52-53 (D.D.C. 2003) (finding, post-First Options, that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference, but without discussion of the "clear and unmistakable evidence" standard). But see Diesselhorst v. Munsey Building, L.L.L.P, 2005 WL 327532, at **3-4 (D. Md. 2005) (holding that incorporation of the AAA rules by reference does not rise to the level of "clear and unmistakable evidence" that the parties intended to have an arbitrator decide threshold issues of arbitrability). Both the Second Circuit in Contec and the Eleventh Circuit in Terminix have expressly concluded that the incorporation of the AAA rules, and specifically Rule R-7(a),

empowering an arbitrator to decide issues of arbitrability serves as clear and unmistakable evidence of an agreement by the parties to have the arbitrator decide issues of the scope of an arbitration clause (i.e., arbitrability).  See Contec, 398 F.3d at 208; Terminix, 432 F.3d at 1332. Accordingly, under these authorities, it is the arbitrator, not this Court, that should decide whether the scope of the Consulting Agreement encompasses the TCS Agreement.

     Not to be deterred, Avue recognizes that the weight of authority is overwhelmingly positioned against it, but claims simply that these cases have been incorrectly decided.  Avue acknowledges that Rule R-7(a) is part of the Consulting Agreement by virtue of the incorporation by reference of the AAA rules generally, and concedes that it is thus bound by the rule.  Avue contends, however, that the language of Rule R-7(a) is permissive in nature, and therefore does not require an arbitrator to consider the scope of his own jurisdiction.  Rather, Avue argues, the language simply means that if the parties submit a claim to arbitration, they cannot challenge the arbitrator's decision by arguing that he lacked jurisdiction to render it.  Hence, according to Avue, the incorporation of Rule R-7(a) into the Consulting Agreement is not "clear and unmistakable evidence" of an intent to submit to the jurisdiction of an arbitrator with respect to the threshold issue of whether the TCS Agreement is within the Consulting Agreement.  This precise question, focused on the allegedly permissive nature of Rule R-7(a), has not been addressed in other cases.

     The Court is not persuaded by Avue's arguments.  To begin with, Rule R-7(a) was enacted in response to First Options: it was specifically meant to satisfy the clear and unmistakable evidence standard.  See Brake Masters, 78 P.3d at 188 n.4.  Moreover, even assuming that the rule is, as Avue contends, permissive in nature, the arbitrator would still be the proper entity to decide whether the TCS Agreement is subject to arbitration.  The language of R-7(a) is clear: "[t]he arbitrator shall

have the power to rule on his or her own jurisdiction, including any objections with respect to the . . . scope . . . of the arbitration agreement." There is no language that limits the application of the rule to the time period after a decision is rendered, or to suggest that the power conferred upon the arbitrator is conditional upon yet another agreement by the parties to submit the claim to arbitration. If Avue desired such limitations, it could have contracted for them. Avue cannot rely on the plain language of the rule to argue that it is permissive, yet back away from or attempt to supplement the plain language in order to advance an interpretation inconsistent with the outcome in the relevant case law.

In this Court's view, Rule R-7(a) means that unless the arbitrator elects not to exercise the power to decide arbitrability that the parties have given him, a court may not jump in to decide the scope of the arbitration agreement at issue. Put another way, when Avue signed a contract that incorporated the AAA rules by reference, it agreed, pursuant to the language of Rule R-7(a), to let the arbitrator decide the issue of which claims submitted by DCI fall within the ambit of the arbitration clause. To the best of this Court's knowledge, the arbitrator has not relinquished that authority. "[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" Book Depot P'ship v. Am. Book Co., 2005 U.S. Dist. LEXIS 33782 at *8-9 & n.3 (E.D. Tenn. 2005) (quoting Contec Corp., 398 F.3d at 208). "[Avue] cannot now disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability." Contec Corp., 398 F.3d at 211 (emphasis in original). Hence, the question "who (primarily) should decide arbitrability," in the construct of First Options, 514 U.S. at 944, is

answered here by "clear and unmistakable evidence" of the parties' intent found in the provisions of their agreement (the incorporated AAA Rule R-7(a)).  That answer is the arbitrator, not this Court.

## CONCLUSION

For the foregoing reasons, the Court concludes that the arbitrator is the proper entity to decide the issue of whether the scope of the arbitration clause of the Consulting Agreement includes the TCS Agreement.  Accordingly, Avue's motion to stay arbitration proceedings will be denied and, since that is the entirety of the relief sought in this action, the case will be dismissed.  A separate order has been issued on this date.


/s/     John D. Bates
JOHN D. BATES
United States District Judge

Date:       April 28, 2006


*Copies to*:

Andrew H. Marks
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 624-2920
Fax: (202) 6285116
Email: amarks@crowell.com

Peter Jacobs Eyre
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
US
(202) 624-2500
Fax: (202) 628-5116
   *Counsel for movant Avue Technologies, Inc.*

Robert Lee Gulley
LATHROP & GAGE
1300 I Street, NW
Suite 1050 East
Washington, DC 20005
(202) 962-0210
Email: rgulley@lathropgage.com

Jill Holtzman Vogel
HOLTZMAN VOGEL PLLC
98 Alexandria Pike
Suite 53
Warrenton, VA 20186
(540) 341-8808
Fax: (540) 341-8809

Richard Nelson Bien
LATHROP & GAGE L.C.
2345 Grand Boulevard
Suite 2500
Kansas City, MO 64108
(816) 292-2000
Fax: (816) 292-2001

      *Counsel for respondent DCI Group, LLC*